FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 14, 2026

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JESSICA A., Plaintiff, v. FRANK BISIGNANO, Commissioner of Social Security, Defendant. | NO. 2:25-CV-0498-TOR<br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S RESPONSE MOTION |

BEFORE THE COURT are Plaintiff's Motion for Summary Judgment (ECF No. 11) and Defendant's Response Motion (ECF No. 15). These matters were submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons discussed below, Plaintiff's motion (ECF No. 11) is **DENIED** and Defendant's motion (ECF No. 15) is **GRANTED**. The Commissioner's denial of Plaintiff's application for benefits under Title XVI of the Social Security Act is **AFFIRMED**.

## JURISDICTION

The Court has jurisdiction over this case pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g). The scope of review under § 405(g) is limited: the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158–59 (9th Cir. 2012) (citing 42 U.S.C. § 405(g)). "Substantial evidence" means relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1159 (quotation and citation omitted). Stated differently, substantial evidence equates to "more than a mere scintilla but less than a preponderance." *Id.* (quotation and citation omitted). In determining whether this standard has been satisfied, a reviewing court must consider the entire record as a whole rather than searching for supporting evidence in isolation. *Id.*

In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence in the record "is susceptible to more than one rational interpretation, [the court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104,

1111 (9th Cir. 2012). Further, a district court "may not reverse an ALJ's decision on account of an error that is harmless." *Id.* An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination." *Id.* at 1115 (quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

## FIVE-STEP SEQUENTIAL EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the meaning of the Social Security Act. First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Second, the claimant's impairment must be "of such severity that [he or she] is not only unable to do [his or her] previous work[,] but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. § 416.920(a)(4)(i)–(v). At step one, the Commissioner considers the claimant's work activity. 20

C.F.R. § 416.920(a)(4)(i). If the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 416.920(b).

If the claimant is not engaged in substantial gainful activities, the analysis proceeds to step two. At this step, the Commissioner considers the severity of the claimant's impairment. 20 C.F.R. § 416.920(a)(4)(ii). If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three. 20 C.F.R. § 416.920(c). If the claimant's impairment does not satisfy this severity threshold, however, the Commissioner must find that the claimant is not disabled. *Id*.

At step three, the Commissioner compares the claimant's impairment to several impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment is as severe or more severe than one of the enumerated impairments, the Commissioner must find the claimant disabled and award benefits. 20 C.F.R. § 416.920(d).

If the severity of the claimant's impairment does meet or exceed the severity of the enumerated impairments, the Commissioner must pause to assess the claimant's "residual functional capacity." Residual functional capacity ("RFC"),

defined generally as the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations (20 C.F.R. § 416.945(a)(1)), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the past ("past relevant work"). 20 C.F.R. § 416.920(a)(4)(iv). If the claimant is capable of performing past relevant work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 416.920(f). If the claimant is incapable of performing such work, the analysis proceeds to step five.

At step five, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. § 416.920(a)(4)(v). In making this determination, the Commissioner must also consider vocational factors such as the claimant's age, education, and work experience. *Id.* If the claimant is capable of adjusting to other work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 416.920(g)(1). If the claimant is not capable of adjusting to other work, the analysis concludes with a finding that the claimant is disabled and is therefore entitled to benefits. *Id.*

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the analysis proceeds to

step five, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers in the national economy." 20 C.F.R. § 416.960(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

## ALJ'S FINDINGS

On February 12, 2020, Plaintiff protectively filed an application for Title XVI supplemental security income benefits, alleging a disability onset date of December 2019. Tr. 258–276. This date was later determined by the Social Security Administration ("SSA") to be December 1, 2019. Tr. 135. The application was denied initially, and again on reconsideration. Tr. 170-173, 177-179. Plaintiff appeared at a telephonic hearing before Administrative Law Judge ("ALJ") Lori L. Freund on September 20, 2021. Tr. 29, 1084–1119. During the hearing, Plaintiff amended her alleged onset date to the protective filing date of February 12, 2020. Tr. 29, 103–134. The ALJ issued an Unfavorable Decision on November 2, 2021. Tr. 1035–1056.

On December 28, 2021, Plaintiff filed a request for review with the Appeals Council. Tr. 249–252. On September 19, 2022, the Appeals Council denied Plaintiff's request for review. Tr. 1–7; 1057–1063. On November 4, 2022, Plaintiff filed an appeal for judicial review to the United States District Court for the Eastern District of Washington. Tr. 1064. The District Court remanded Plaintiff's case for

further consideration. Tr. 1064–1072. In its Order remanding Plaintiff's case to the Commissioner for further proceedings, the District Court determined that the ALJ erred by dismissing Dr. Thomas Genthe's psychological opinion as mere observation of Plaintiff's self-report. Tr. 1067–1070; citing *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017).

On February 20, 2024, the Appeals Council issued an order vacating the final decision of the Commissioner and remanding Plaintiff's case to an ALJ for further proceedings consistent with the order of the District Court. Tr. 1073–1077. A supplemental hearing was held on October 8, 2024, before ALJ Malcom Ross. Tr. 1010–1034. The ALJ issued an Unfavorable Decision on April 10, 2025. Tr. 980–1009. On April 21, 2025, Plaintiff filed her written exceptions to that decision which the Appeals Council exhibited per its notice on October 14, 2025. Tr. 973, 1174–1176. Also on October 14, 2025, the Appeals Council issued its decision to deny review, making the ALJ's decision the final decision subject to judicial review. Tr. 969–974; 20 C.F.R. § 416.1481. Plaintiff filed a timely appeal to this Court.

At step one of the sequential evaluation analysis, the ALJ found Plaintiff had not engaged in substantial gainful since February 12, 2020, the amended alleged onset date and application date. Tr. 986. At step two, the ALJ found Plaintiff had the following severe impairments: nonepileptic seizures; obesity; bipolar disorder; anxiety disorder with compulsive features; and borderline personality disorder. *Id.*

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Tr. 987. The ALJ then found Plaintiff had a residual functional capacity to perform medium work with the following limitations:

> [O]ccasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; no exposure to extreme vibrations or hazards such as unprotected heights and dangerous machinery; able to understand, remember, and carry out simple and well-learned complex tasks; working in approximately two-hour intervals with standard work breaks provided; working away from the general public with no job tasks requiring public interaction; no job tasks requiring collaboration with co-workers; a routine, predictable workplace setting; and with work goals set by others.

Tr. 989.

At step four, the ALJ found Plaintiff has no past relevant work. Tr. 1001. At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, and testimony from a vocation expert, there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as hand packager, industrial cleaner, marker, and hospital cleaner. Tr. 1001–1003. The ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since February 12, 2020, the amended alleged onset date and date the application was filed. Tr. 1003.

## ISSUES

Plaintiff seeks judicial review of the ALJ's final decision denying her supplemental security income benefits under Title XVI of the Social Security Act. Plaintiff raises the following issues:

1. Whether the ALJ failed to comply with the District Court's Order;
2. Whether the ALJ properly weighed the medical opinion evidence;
3. Whether the ALJ properly considered Plaintiff's subjective symptom testimony; and
4. Whether the ALJ properly met her burden at step five.

ECF No. 11 at 2, 9–18.

## DISCUSSION

**A. Compliance with District Court Order**

Plaintiff argues that the ALJ failed to comply with the District Court's Order. ECF No. 11 at 9. Specifically, she asserts that on remand the ALJ was directed to properly evaluate the medical opinion evidence and Plaintiff's symptom testimony, but the ALJ repeated the same errors. *Id.*

An ALJ is required to follow the mandate of the District Court and meaningfully address the deficiencies identified on remand. *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989), *overruled on other grounds in Shalala v. Schaefer*, 509 U.S. 292, 300 n.4 (1993). "Deviation from the court's remand order in the subsequent

administrative proceedings is itself legal error, subject to reversal on further judicial review." *Id.* at 886 (citation omitted). "The burden is on the party claiming error to demonstrate not only the error, but also that it affected his 'substantial rights,' which is to say, not merely his procedural rights." *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012).

Plaintiff argues that the ALJ once again rejected probative examining source evidence on selective citation to normal findings, discounted Plaintiff's symptom testimony without legally sufficient reasons, and failed to reconcile conflicting evidence in the longitudinal record. ECF No. 11 at 9. She contends that the ALJ's decision is not the reevaluation of the evidence as directed by the Court in the prior proceeding as much as it is a restatement of the same reasoning in the previous decision that was rejected by this Court. *Id.* at 9–10.

Defendant asserts that Plaintiff fails to identify any specific ways in which the ALJ committed error, much less demonstrate prejudice or unfairness, and has therefore forfeited the issue. ECF No. 15 at 3–4; citing *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (reviewing only issues that were argued specifically and distinctly in opening brief and declining to "manufacture arguments" for an appellant).

The only reasoning addressed by the District Court in its prior decision was the ALJ's finding that Dr. Genthe's opinion was unsupported because he relied on

Plaintiff's subjective reports. Tr. 41, 1068–1070. The Court determined that the "ALJ was not required to accept Dr. Genthe's opinion, but it was error to dismiss his evaluation as mere observation of self-report." Tr. 1070. The Court noted that Plaintiff also argued the ALJ erred by improperly assessing the medical opinion of Jay Toews, Ed.D., failing to conduct an adequate step three inquiry, rejecting lay witness testimony, rejecting Plaintiff's subjective complaints, and failing to conduct an adequate step five inquiry. *Id*. The Court found the analysis of these issues could be impacted by the ALJ's assessment of Dr. Genthe's opinion, and therefore instructed the ALJ to reevaluate those issues on remand as well. *Id*.

In the decision at issue before this Court, the ALJ provided numerous reasons in finding Dr. Genthe's opinion to be unpersuasive, including that Dr. Genthe's examination findings did not support his marked limitations and were inconsistent with Plaintiff's ability to engage in activities of daily living and functioning throughout the longitudinal record, and his opinion was inconsistent with other mental status examinations in the record. Tr. 999–1000. Plaintiff's argument that the ALJ repeated his erroneous reasoning from the prior ALJ decision in finding Dr. Genthe's psychological opinion to be unpersuasive, is without merit. As discussed in more detail below, the Court finds that the ALJ provided substantial evidence when analyzing the opinions of Dr. Genthe and Dr. Petaja, and Plaintiff's subjective

symptom testimony. Therefore, the ALJ did not fail to comply with the District Court's Order.

**B. Medical Opinion Evidence**

Plaintiff argues the ALJ erred by failing to properly evaluate the medical opinion evidence of Dr. Thomas Genthe, examining psychologist, and Dr. Holly Petaja, reviewing psychologist. ECF No. 11 at 11–16.

For claims filed on or after March 27, 2017, new regulations apply that change the framework for how an ALJ must evaluate medical opinion evidence. 20 C.F.R. § 416.920c; *see also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844–01 (Jan. 18, 2017).

Under the new regulations, the ALJ will no longer "give any specific evidentiary weight . . . to any medical opinion(s)." *Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844–01, 5867–68. Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. § 416.920c(a)–(b). The factors for evaluating the persuasiveness of medical opinions and prior administrative medical findings include supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an

understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 416.920c(c)(1)–(5).

The ALJ is required to explain how the most important factors, supportability and consistency, were considered. 20 C.F.R. § 416.920c(b)(2). These factors are defined as follows:

> (1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 416.920c(c)(1)–(2).

The ALJ may, but is not required to, explain how "the other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. 20 C.F.R. § 416.920c(b)(2). However, where two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how "the most persuasive factors" were considered. 20 C.F.R. § 416.920c(b)(2).

*1. Thomas Genthe, PhD, Examining Psychologist*

On January 6, 2020, Dr. Genthe conducted a psychological evaluation of Plaintiff. Tr. 85–95; Tr. 378–388 (duplicate); Tr. 1222-1235 (duplicate). Under his clinical findings, Dr. Genthe reported that Plaintiff had depression, panic, and autism. Tr. 87. Based on a clinical interview, mental status examination, and psychometric assessment, Dr. Genthe opined that Plaintiff had marked limitations in communicating and performing effectively in a work setting, maintaining appropriate behavior in a work setting, completing a normal workday and workweek without interruptions from psychologically based symptoms, and setting realistic goals and planning independently. Tr. 85–95.

The ALJ found Dr. Genthe's opinion to be unpersuasive. Tr. 999. Plaintiff argues the ALJ's analysis "falls far short" of the District Court's instruction that Dr. Genthe's opinion must be reconsidered on remand. ECF No. 11 at 16. Plaintiff's main challenge to the ALJ's evaluation of Dr. Genthe's opinion concerns the Personality Assessment Inventory ("PAI"). *Id.* at 11–15. She contends that Dr. Genthe's opinion must be considered a verity, with no implication of malingering. *Id.* at 16. Defendant asserts that substantial evidence supports the ALJ's evaluation of Dr. Genthe's medical opinion. ECF No. 15 at 4. The Court agrees with Defendant.

As to supportability, the ALJ reasoned that Dr. Genthe's opinion was not persuasive because his findings do not support the marked limitations that he assessed. Tr. 999. Specifically, the ALJ determined that the marked limitations are not supported by Dr. Genthe's own mental status examination findings, which were largely within normal limits. *Id.*; citing Tr. 90–91 (Plaintiff appeared well groomed with good hygiene and appropriately dressed; she appeared nervous but reported her mood as "OK" and was alert, fully oriented, cooperative, and friendly and understood instruction given during the mental status examination; she had normal speech, thought content, thought process, perception, memory, concentration, fund of knowledge, abstract thinking, insight, and judgment.) Further, the ALJ determined that Dr. Genthe's assessment of autism spectrum disorder is not well-supported by his evaluation or by the medical evidence of record, and this alone would have skewed his opinions. Tr. 1000.

As to consistency, the ALJ determined that Dr. Genthe's findings of marked limitations were inconsistent with Plaintiff's ability to engage in activities of daily living and functioning throughout the longitudinal record. Tr. 1000. The ALJ cited Plaintiff's ability to engage in independent self-care, household chores, shopping, taking care of a dog, starting a new relationship, going on trips and traveling, going to casinos for entertainment, preparing easy and complex meals, renewing prescriptions, and scheduling her own doctor's appointments. Tr. 996, 1000; *see,*

*e.g.* Tr. 302–08, 379–380, 800, 1662, 1877, 2023. The ALJ also determined that Dr. Genthe's assessed marked limitations are inconsistent with the other mental status examinations of record, as Plaintiff has typically presented with an unremarkable mental status. Tr. 1000; citing Tr. 435, 438, 557–558, 560-561, 568, 651, 656, 662, 665, 670, 740, 743, 751, 754, 771, 777; 786–787, 795, 805, 818 (normal appearance, attitude, psychomotor activity, eye contact, affect, speech, thought process, thought content, attention, concentration, cognitive functioning, comprehension, memory, judgment, insight) other than occasional abnormal mood (anxious or depressed) or affect (restricted, sad); Tr. 585 (June 2020: neuropsychological evaluation suggested Plaintiff was functioning at least within normal limits within many cognitive domains); Tr. 560 (August 2020: Plaintiff reported that she had in the past maintained motivation when there was a specific outside system such as a job (which the ALJ found indicated that a job might actually be beneficial for her mental health symptoms); Tr. 741, 788, 795, 806, 810 (September 2020, February 2021, April 2021, July 2021: Plaintiff has made progress in her mental health treatment goals).

Plaintiff takes issue with the ALJ's discussion of a PAI conducted by Dr. Genthe. ECF No. 11 at 11; citing Tr. 385–386. She argues that in support of his rejection of Dr. Genthe's opinion, the ALJ focused on the portion of the PAI which discussed an overview analysis of Plaintiff's responses but the ALJ ignored the portion of the same PAI which supports Plaintiff. ECF No. 11 at 11. Specifically,

Plaintiff notes that the PAI stated, "Nonetheless, profile patterns of this type are usually associated with marked distress, and unless there is extensive distortion or exaggeration of symptomatology, severe impairment in functioning is typically present." *Id.*; citing Tr. 386. Plaintiff asserts that this portion of the PAI analysis was ignored by the ALJ and supports Dr. Genthe's opinions and conclusions. ECF No. 11 at 11–12. She argues that the ALJ improperly cherry-picked one caution note expressed in one sentence from the PAI that was tentative on its face and ignored the contrary supporting evidence and the affirmative conclusions, none of which conclude that Plaintiff is malingering. *Id.* at 12.

Defendant responds that Plaintiff incorrectly assumes the ALJ made a finding of malingering based on the PAI assessment. ECF No. 15 at 7. Defendant argues that instead the ALJ noted evidence "indicated" malingering but that Dr. Genthe "did not further discuss that or the weight he assigned it." *Id.*; citing Tr. 1000. Therefore, Defendant asserts, the ALJ did not make a finding of malingering based on Dr. Genthe's report but instead found that the portion of the report discussing the PAI and malingering was confusing and not well supported. ECF No. 15 at 7; citing Tr. 1000.

The Court finds that in analyzing Dr. Genthe's opinion, the ALJ adequately provided supportability and consistency explanations supported by substantial evidence.

*2. Holly Petaja, PhD, Reviewing Psychologist*

On January 15, 2020, Dr. Petaja completed a "Review of Medical Evidence[.]" Tr. 96–98. Dr. Petaja indicated that she reviewed Dr. Genthe's report from January 6, 2020, and mirrored Dr. Genthe's assessed limitations. Tr. 96–97. Dr. Petaja listed Plaintiff's functional symptoms as mood disturbance, anhedonia, and anxiety, and indicated a severity rating of "4" for each symptom. Tr. 98.

The ALJ found Dr. Petaja's opinion to be unpersuasive. Tr. 1001. The ALJ determined that Dr. Petaja's opinion is unsupported because she did not evaluate Plaintiff and only reviewed Dr. Genthe's report. *Id*. The ALJ noted that Dr. Petaja did not review any of Plaintiff's treatment records, and thus, she was unaware of the longitudinal picture of Plaintiff's mental health impairment and treatment. *Id*. Further, the ALJ found Dr. Petaja's opinion to be inconsistent with the psychological treatment notes for the same reasons as Dr. Genthe's opinion. *Id*.

Plaintiff argues that if Dr. Genthe's report is given proper weight, then so must that of Dr. Petaja. ECF No. 11 at 16. Defendant asserts that Plaintiff's challenge to Dr. Petaja's opinion relies entirely on her establishing that the ALJ erred in evaluating Dr. Genthe's opinion. ECF No. 15 at 9. As discussed above, the Court finds that the ALJ did not err in determining that De. Genthe's opinion was not persuasive. The Court finds that in analyzing Dr. Petaja's opinion, the ALJ

adequately provided supportability and consistency explanations supported by substantial evidence.

**C. Plaintiff's Symptom Testimony**

Plaintiff contends the ALJ erred in rejecting her subjective symptom testimony. ECF No. 11 at 16. An ALJ engages in a two-step analysis to determine whether a claimant's subjective symptom testimony can be reasonably accepted as consistent with the objective medical and other evidence in the claimant's record. Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2. "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Molina*, 674 F.3d at 1112 (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "The claimant is not required to show that her impairment 'could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'" *Vasquez*, 572 F.3d at 591 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)).

Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citations

omitted). General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims. *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why he or she discounted claimant's symptom claims). "The clear and convincing [evidence] standard is the most demanding required in Social Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." SSR 16-3p, 2016 WL 1119029, at *2. When evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the following factors should be considered: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning an individual's

functional limitations and restrictions due to pain or other symptoms. *Id.* at *7–8; 20 C.F.R. § 416.929(c)(3).

Here, the ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. 989.

**1. Objective Medical Evidence**

The ALJ concluded that the objective medical evidence did not support Plaintiff's allegations of symptom severity and resulting functional limitations to the degree that she alleged. Tr. 991. An ALJ may not discredit a claimant's symptom testimony and deny benefits solely because the degree of the symptoms alleged is not supported by objective medical evidence. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell v. Sullivan*, 947 F.2d 341, 346–47 (9th Cir. 1991); *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). However, the objective medical evidence is a relevant factor, along with the medical source's information about the claimant's pain or other symptoms, in determining the severity of a claimant's symptoms and their disabling effects. *Rollins*, 261 F.3d at 857; 20 C.F.R. § 416.929(c)(2).

The ALJ determined that the record indicates Plaintiff's seizure-like episodes or spells have not taken place at the frequency alleged, which is one to two times per

month. Tr. 991–993; *see, e.g.*, Tr. 442 (February 2020: Plaintiff reported that prior to the seizure she had that day, her last seizure had been two months prior; her seizures lasted for a few seconds to a couple of minutes, which was "much improved" since she first had seizures; on examination she was alert and cooperative with no neurological deficits; speech was fluid and logical; was able to toe walk, heel walk, and toe to heel walk, with normal range of motion); Tr. 628 (February 2020: a neurological exam two days after her seizure was "completely normal"); Tr. 571 (April 2020: Plaintiff reported her last seizure had been 1.5 months prior); Tr. 567, 590–591 (May 2020: Plaintiff was admitted to the epilepsy monitoring unit for two days and had a non-epileptic event typical of those she had been having at home, which involved whole-body jerking movements and unresponsiveness; there were no EEG changes associated with this event); Tr. 585–586 (May 2020: results of the evaluation suggested that Plaintiff was functioning at least within normal limits within many cognitive domains; it was recommended that she continue to engage in individual psychotherapy to help develop additional coping strategies to deal with day-to-day stressors); Tr. 583 (June 2020: Plaintiff was seen for a neuropsychological evaluation upon referral of her neurologist to assess her level of cognitive functioning as part of a larger presurgical evaluation; she reported that following medication changes her convulsive episodes now happened once every couple months and the episodes lasted 5-7 minutes); Tr. 588–589 (June 2020: it was

again noted by the epilepsy surgery conference that Plaintiff showed no evidence of epilepsy and that her episodes endorsed as seizures were in fact nonepileptic spells); Tr. 568 (July 2020: Plaintiff was advised by a neurologist that such non-epileptic spells were not treated with antiseizure medications and was instructed to come off lamotrigine; she reported no psychogenic nonepileptic spells since her diagnosis, and her neurologist was hopeful that she would continue to do well); Tr. 563 (July 2020: Plaintiff reported no functional seizure-type episodes in about two months); Tr. 560 (August 2020: Plaintiff denied any further episodes of functional spells); Tr. 553 (August 2020: after she had been weaned off lamotrigine, she reported no uptick in seizure activity); Tr. 757 (September 2020: at a behavioral health visit Plaintiff denied any recurrence of seizure-like activity); Tr. 748–749 (November 2020: Plaintiff reported a seizure five days prior that had lasted almost 15 minutes; afterwards she could not understand speech or communicate properly and reported a headache, which was unusual; CT of the head showed a stable cavernous angioma and no acute findings; on examination, no neurological or psychiatric abnormalities were noted); Tr. 746 (January 2021: Plaintiff reported to neurology that she had been doing well with her non-epileptic events and was able to detect triggers (stress, anxiety) and remove herself from the anxiety-provoking setting; events typically lasted five minutes and that she was able to understand her parents and sit up and take a drink afterward; she was able to manage these events; she reported having a

typical event roughly every 2-3 months; she reported that she had not had another event since November 2020); Tr. 747 (January 2021: Plaintiff's neurologist felt that it was possible her November 2020 event was a withdrawal seizure related to abrupt discontinuation of a medication (Lamictal)); Tr. 804 (February 2021: Plaintiff reported no episodes since November 2020); Tr. 835–836 (February 2021: Plaintiff was seen in the emergency department for a seizure episode; she had an uneventful course in the emergency department and had notable improvement with medications, ambulating and talking without difficulty); Tr. 673–674, 676, 678, 680, 694 (March 2021: Plaintiff was admitted after a seizure-like episode in clinic; CT of the head was nonacute and EEG was normal; it captured only one spell consisting of right arm then upper body shaking, with retained consciousness, anxiety, and tachycardia – this was not associated with any EEG abnormalities; her abnormal movements were felt to be due to underlying psychiatric issues); Tr. 662–663 (March 2021: Plaintiff reported no events since her discharge; neurologic exam was normal and she reported that she was re-prioritizing her mood disorder); Tr. 795 (April 2021: Plaintiff reported during a behavioral health visit that she had been seizure-free since her last assessment).

Further, the ALJ also noted that at behavioral health visits to address depressed mood and functional neurological episodes, Plaintiff typically presented with an unremarkable mental status. Tr. 993; citing Tr. 435, 438, 557–558, 560-561,

568, 651, 656, 662, 665, 670, 740, 743, 751, 754, 771, 777; 786–787, 795, 805, 818 (normal appearance, attitude, psychomotor activity, eye contact, affect, speech, thought process, thought content, attention, concentration, cognitive functioning, comprehension, memory, judgment, insight) other than occasional abnormal mood (anxious or depressed) or affect (restricted, sad).

The ALJ cited objective medical evidence to contradict Plaintiff's testimony that she has about one to two seizures per month, that it took a couple of hours to recover after a seizure, and she has about three good days in a typical week. Tr. 990. The Court finds that the ALJ did not err in his determination that the objective medical evidence does not support Plaintiff's testimony that she was unable to work mainly due to seizures and mental health issues. Tr. 990–993.

**2. Daily Activities**

The ALJ determined that Plaintiff's activities are not limited to the extent one would expect given her complaints of disabling symptoms and limitations. Tr. 996. Specifically, the ALJ found the evidence showed that Plaintiff was capable of managing herself in order to take part in a relatively normal daily or weekly routine. Tr. 996–997; citing Tr. 302–08, 379–380, 800, 1662, 1877, 2023 (Plaintiff was in a relationship, has a new boyfriend, goes on trips/traveling, and goes out to places such as casinos for entertainment); Tr. 301–308 (Plaintiff reported that she has friends although most of them do not live close enough to visit much, her chore is taking

care of the dog, she prepares “some easy, some complex” meals twice a day, takes out the trash, does laundry, wash dishes, and grocery shops with her parents, does art daily and frequently takes her dog for walks and/or walks to the store if it is nice out); Tr. 379–380 (Plaintiff reported being able to care for her hygiene needs, including taking regular baths and/or showers, brushing her teeth and combing her hair, changing clothes as needed, she prepares her own meals and feeds herself; she is able to independently perform tasks such as washing dishes, doing laundry, vacuuming and dusting, she generally takes her own medication and is able to renew her prescriptions as needed, she typically schedules her own appointments with doctors or other offices, she is able to use telephones, and directories, and mail parcel at the post office, she is able to go shopping for groceries and other personal needs whenever she needs them); Tr. 436 (April 2020: Plaintiff reported that she was helping her sister out with babysitting); Tr. 584 (May 2020: Plaintiff reported that she lived with her father and was able to manage all basic activities of daily living independently without difficulty; she reported requiring some help with instrumental activities of daily living, such as needing reminders from her parents to take medications and needing her parents to help with performing household chores due to memory issues).

The ALJ reasonably found Plaintiff's activities were inconsistent with her allegations of disabling limitations. This was a clear and convincing reason to reject Plaintiff's symptom claims.

**3. Inconsistent Statements**

The ALJ discounted Plaintiff's symptom testimony in part because of inconsistent statements made in connection with her seizure activity and disability claim. Tr. 993–996. An ALJ may consider inconsistent statements by a claimant in assessing her credibility. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

The ALJ determined that at times, it appears Plaintiff was seeing physicians in order to generate evidence for her disability application and appeal, rather than in a genuine attempt to obtain relief from the allegedly disabling symptoms (e.g., seeking autism diagnosis). Tr. 996. The ALJ stated that although inconsistent information may not be the result of a conscious intention to mislead, it suggests the information Plaintiff provided may not be entirely reliable, which undermines the overall reliability of her allegations in the disability application and appeal. *Id.*; citing Tr. 584 (May 29, 2020: Plaintiff "indicated that she has been seeking an autism spectrum diagnosis for some time, but has yet to be formally evaluated for autism); Tr. 543 (July 28, 2020: "Trying to get autism diagnosis in Seattle. No appointment yet); Tr. 553 (August 17, 2020: Plaintiff "reports concern for autism based on response to external stimuli. Pt reports poor ability to read, poor social skills, and

undefined learning disabilities"); Tr. 346–347 (October 7, 2020: Plaintiff's employer, McDonald's, stated, "Jessica was very pleasant with coworkers and our customers. A pleasure to work with!"); Tr. 332–334 (October 20, 2020: Plaintiff's employer, Jack's, stated, "Such a nice employee. We moved her from server to strictly hostess, to see if stress induced seizures, but it was still a problem for her… Wonderful girl; good with customers & coworkers. She did have to quit, we understood & were sorry to lose her"); Tr. 680–735 (March 2021: Plaintiff was in the emergency room for seizure activity and the provider opined, "The patient was evaluated by the on-call neurologist, and during this evaluation, I was called back to the bedside. The patient was exhibiting entirely different 'seizure-like' movements during this evaluation, that were highly suggestive of psychogenic nonepileptiform seizures. We discussed how this was very different than her initial presentation, as described above, which was highly suggestive of true seizure activity, although given the fact that the patient is not clearly exhibiting signs of PNES, it is hard to know. She was given a dose of haloperidol for anxiety and psychogenic agitated movements."); Tr. 800 (March 16, 2021: Plaintiff "does report symptoms of impulsivity. Patient provides as example overspending at the casino recently"); Tr. 328 (August 18, 2020: Plaintiff reported that she does not really spend time with people and has minimal contact with friends); Tr. 2359 (December 19, 2022: "Patient reported that she is curious about having an Autism Diagnosis); Tr. 2259,

2296, 2326 (January 23, 2023: Patient shared information about her boyfriend when they traveled to Seattle for her MRI on his birthday, and “my parents gave him the gift of paying for us to stay a couple nights and go out.”); Tr. 2023 (July 5, 2023: Plaintiff “reports she went to the casino to celebrate the 4th of July”); Tr. 1877 (October 31 2023: “Jessie reports she is doing well and just returned from a trip to Las Vegas. The patient shared she enjoyed meeting up with a friend she met online while she was there”); Tr. 1763 (December 6, 2023: Plaintiff had not been eating out regularly, “but they went on a family vacation after Thanksgiving and she ate out for every meal.”); Tr. 1662 (January 22, 2024: “The patient shared that she has started a long[]distance relationship with a guy named Anthony. The patient shared he is going to visit her in April. The patient shared they met through friends of friends online. The patient shared that her parents have met him online, and she has met his parents online as well. The patient shared this has felt like a more mature relationship than she’s had in the past.”); Tr. 1568, 1578 (June 10, 2024: Plaintiff “shared she has started a relationship with a friend she met online. Patient shared this has been a positive factor in her life.” She also stated, “she was just diagnosed with autism by a doctor associated with Social Security disability. She has been denied SSI 3 times and is now working with a lawyer. She does not drive. She has seizures, not as frequent - Full body shaking. Her speech gets slower. Her balance is bad for a couple days afterwards. Her recovery afterwards is longer than it used

to be. These occur[] every 3-4 months. These are the same as the seizures before the surgery, just takes longer to recover.")

The Court finds that the ALJ's determination that Plaintiff offered inconsistent statements about her seizure activity and disability claim is supported by substantial evidence.

**4. Other Factors**

The ALJ also determined that other factors undermine the reliability of Plaintiff's allegations, such as her report that she cannot work because there are no job opportunities in the small town she lives in, particularly with her only past work being in fast food and waitressing. Tr. 996; citing Tr. 338 ("There are no job opportunities in her small, rural town let alone ones within walking distance of house."); Tr. 344 ("No job opportunities in small town lives in, past work only fast food, waitressing which is liability.")

Even if the ALJ erred in addressing this factor, the error would not be a basis for remand because the ALJ provided other valid reasons for discounting Plaintiff's symptom testimony. *See Molina*, 674 F.3d at 1115 (holding that ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record). The ALJ provided other clear and convincing reasons supported by

substantial evidence to discount Plaintiff's symptom testimony, so to the extent there is any error, the error is harmless.

Overall, the Court finds that the ALJ provided clear and convincing reasons for discounting Plaintiff's subjective symptom testimony. Therefore, the Court does not find that the ALJ erred in his findings related to Plaintiff's subjective complaints.

**D. Lay Witness Statements**

At the end of Plaintiff's section addressing her symptom testimony, she makes a brief reference to the ALJ's error in considering the lay witness statements. ECF No. 11 at 17. Specifically, Plaintiff asserts, "the ALJ completely mischaracterized the PAI test results and statements by the plaintiff's employers and family members. The ALJ was required to provide clear and convincing reasons for rejecting this evidence and by mischaracterizing it, he failed to meet this burden." *Id.* The parties disagree on the level of discussion that an ALJ must give lay witness testimony. *Id.*; ECF No. 15 at 18.

As noted above, the Social Security Administration promulgated new regulations in 2017, which apply to claims filed on or after March 27, 2017. On September 18, 2026, the Ninth Circuit held that the 2017 revisions to the Social Security Administration's regulations did not abrogate the "germane reasons" standard for discrediting lay testimony in cases involving claims filed on or after March 27, 2017. *Fain v. Bisignano*, No. 25-3219, 2026 WL 2795427 (9th Cir. Sept.

18, 2026). The Ninth Circuit determined, "the regulations clearly contemplate that nonmedical sources provide information that may be valuable to ALJs' disability determinations." *Id.* at *6; citing 20 C.F.R. § 404.1529(c)(3) ("The information that . . . medical sources or nonmedical sources provide about [a claimant's] pain or other symptoms . . . is also an important indicator of the intensity and persistence of [the claimant's] symptoms."); *see also* 20 C.F.R. § 416.929(c)(3) (same). In *Fain*, the Ninth Circuit concluded that the ALJ harmfully erred in failing to give a reason, germane or otherwise, for rejecting the lay testimony of the claimant's partner. *Id.*

Plaintiff correctly contends that the ALJ must give reasons that are germane to each witness to discount the testimony of the lay witnesses. ECF No. 11 at 17. Defendant argues that even if the ALJ had erred in evaluating statements from Plaintiff's employers and family members, the error was inconsequential. ECF No. 15 at 18; citing *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (explaining that ALJ had properly rejected the claimant's complaints, and, "because [the lay witness'] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness'] testimony").

Here, the ALJ explicitly stated that he considered the information provided in third party lay witness statements. Tr. 1001. He noted that the statements from Plaintiff's past employers discuss how Plaintiff was friendly, pleasant, and good with customers and coworkers but stopped working due seizures on the job, although

both of these employers indicated that she quit, not that they let her go. *Id.*; citing Tr. 332–334, 346–347. The ALJ stated that Plaintiff's mother described frequent, unpredictable seizures and described what happened during and after the seizures. Tr. 1001; citing Tr. 369, 1204. The ALJ stated that he took judicial notice of these lay witness statements submitted on behalf of Plaintiff, and stated that he considered them in the decision. Tr. 1001.

Further, the ALJ references the lay witness statements throughout the opinion. *See* Tr. 988 ("However, her former employer (she worked as a server and hostess at a restaurant, See e.g., Exhibit 7E/1) described her as 'such a nice employee' and 'good with customers and coworkers' (See e.g., Exhibits 7E/3; See also Exhibit 10E)); Tr. 990–991 ("The claimant's subjective complaints alleging limitations beyond those described in the residual functional capacity are not consistent with the record as a whole. Initially, it is noted that the claimant's most recent employer at Jacks at the Market (where she worked as a server/hostess from June to December 2019, See e.g., Exhibit 7E/1) described her in positive terms, stating that she was a 'wonderful girl,' 'such a nice employee,' and 'good with customers and coworkers.' The employer noted that the claimant's work attendance was affected by her condition (seizures, See e.g., Exhibit 7E/3) and that she would need to leave her shift and take time off to recover. Nonetheless, this employer indicated that the claimant herself quit, she was not fired or laid off (See e.g., Exhibit 7E/1, 3). Prior to this, the

claimant had quit another job at McDonald's (where she worked for approximately 1.5 years; See e.g., Exhibit 10E/1) to take the job at Jacks at the Market (See e.g., Exhibit 10E/1), which unrelated to her impairments. She had had two seizures at the workplace during her job at McDonald's (See e.g., Exhibit 10E/2). Therefore, it appears that, despite the claimant's medical issues, her performance and attendance at past jobs were adequate enough for her employers not to terminate her employment prior to the amended alleged onset date."); Tr. 994 ("October 7, 2020: the claimant's employer McDonald's stated, 'Jessica was very pleasant with coworkers and our customers. A pleasure to work with!' (See e.g., Exhibit 10E)"); Tr. 994 ("October 20, 2020: the claimant's employer Jack's stated, 'Such a nice employee. We moved her from server to strictly hostess, to see if stress induced seizures, but it was still a problem for her… Wonderful girl; good with customers & coworkers. She did have to quit, we understood & were sorry to lose her' (See e.g., Exhibit 7E/3)."); Tr. 998 ("However, both of the claimant's former employers described her in positive terms with respect to her ability to interact with others ('such a nice employee,' 'good with customers and coworkers,' 'wonderful girl,' 'very pleasant with coworkers and our customers,' 'a pleasure to work with' (See e.g., Exhibits 7E/3; 10E/2).); Tr. 1000 ("Yet, the claimant's reports are not entirely reliable, as discussed in this decision. For example, the claimant indicated the reason

she was not working was because she had been laid off, but her employers confirm that she quit (Exhibits 7E/3; 10E/1).")

In *Fain*, the Ninth Circuit concluded that the ALJ harmfully erred in failing to give a reason, germane or otherwise, for rejecting the lay testimony of the claimant's partner. *Fain v. Bisignano*, No. 25-3219, 2026 WL 2795427, at *6. Here, the ALJ did not reject the lay witness statements, but instead took judicial notice of these lay witness statements submitted on behalf of Plaintiff, and stated that he considered them in the decision. Tr. 1001. Thus, the ALJ did not err in his consideration of the lay witness statements.

**E. Step-Five Determination**

Plaintiff contends the ALJ erred because the step-five finding is not supported by substantial evidence. ECF No. 11 at 17–18. However, Plaintiff's argument is based entirely on the assumption that the ALJ erred in considering the medical opinion evidence, Plaintiff's symptom claims, and the lay witness statements. *Id.* For reasons discussed throughout this decision, the ALJ's consideration of the medical opinion evidence, Plaintiff's symptom claims, and the lay witness statements are legally sufficient and supported by substantial evidence. Thus, the ALJ did not err in finding Plaintiff capable of performing other work in the national economy based on the hypothetical containing Plaintiff's RFC. Plaintiff is not entitled to remand on these grounds.

Having reviewed the record and the ALJ's findings, the Court concludes that the ALJ's decision is supported by substantial evidence and free of harmful legal error.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Summary Judgment (ECF No. 11) is **DENIED**.

2. Defendant's Response Motion (ECF No. 15) is **GRANTED**.

The District Court Executive is directed to enter this Order, enter judgment for Defendant, provide copies to counsel, and **CLOSE** this file.

DATED October 14, 2026.

THOMAS O. RICE
United States District Judge